Lilian S. ILETO, an individual and mother to Joseph S. Ileto, deceased; Joshua Stepakoff, a minor, by his parents Loren Lieb and Alan B. Stepakoff; Mindy Gale Finkelstein, a minor, by her parents David and Donna Finkelstein; Benjamin Kadish, a minor by his parents Eleanor and Charles Kadish; Nathan Lawrence Powers, a minor by his parents Gail and John Michael Powers, for himself and on behalf of a class of persons similarly situated, Plaintiffs–Appellants,

v.

GLOCK INC., a Georgia Corporation; China North Industries Corp., a Chinese entity aka Norinco; Davis Industries, a California Corporation; Republic Arms Inc., a California Corporation; Jimmy L. Davis, an individual; Bushmaster Firearms, a Maine Corporation; RSR Management Corporation; RSR Wholesale Guns Seattle Inc., Defendants–Appellees,

and

Maadi, an Egyptian business entity; Imbel, a Brazilian business entity; The Loaner Pawnshop Too, a Washington Corporation; David McGee, an individual; Glock GMBH, an Austrian business entity, Defendant.

No. 02–56197.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 3, 2003.

Filed Nov. 20, 2003.

---

**1194**

Peter Nordberg, Berger & Montague, P.C., Philadelphia, PA, and Sayre Weaver, The Educational Fund to Stop Gun Violence, Washington, D.C., for the plaintiffs-appellants.

Christopher Renzulli and John F. Renzulli, Renzulli, Pisciotti & Renzulli, LLP, New York, NY; Mark T. Palin, Arter & Hadden, LLP, Irvine, CA, for defendant-appellee Glock, Inc. and defendants-appellees RSR Management Corp. and RSR Group Nevada, Inc.

Daniel K. Dik and Todd E. Croutch, Fonda & Fraser, LLP, Los Angeles, CA, for defendant-appellee Quality Parts Co., sued as Bushmaster Firearms.

Charles H. Dick, Jr., and Colin H. Murray, Baker & McKenzie, San Diego, CA, for defendant-appellee China North Industries Corp.

Before HALL, THOMAS, and PAEZ, Circuit Judges.

Opinion by Judge PAEZ. Dissent by Judge CYNTHIA HOLCOMB HALL.

## OPINION

PAEZ, Circuit Judge.

On August 10, 1999, Buford Furrow ("Furrow") shot and injured three young children, one teenager, and one adult at the Jewish Community Center ("JCC") in Granada Hills, California. Furrow fled the JCC with his weapons and, later that day, shot and killed Joseph Ileto ("Ileto"), a United States Postal worker who was delivering mail in Chatsworth, California.

Ileto's sole surviving dependent parent and three of the children who were shot at the JCC filed a complaint in the Los Angeles Superior Court against multiple defendants involved in the manufacture, marketing, and distribution of various firearms found in Furrow's possession. The case was removed to federal district court, where the plaintiffs asserted negligence and public nuisance claims against several gun manufacturers, distributors, and dealers. These defendants filed motions to dismiss under Fed.R.Civ.P. 12(b)(6), and all motions were granted. Plaintiffs appeal the dismissal of their public nuisance and state law negligence claims.[1]

Because the plaintiffs have stated a cognizable claim under California tort law for negligence and public nuisance against the manufacturers and distributor of the guns used in the shootings, we reverse the district court's dismissal against the plaintiffs and in favor of defendants Glock, Inc., China North Industries Corp., RSR Management Corp. and RSR Wholesale Guns Seattle Inc. We affirm the district court's dismissal in favor of all other defendants.[2]

1. When we refer to "plaintiffs," we include Benjamin Kadish, Joshua Stepakoff, Mindy Finkelstein, Nathan Powers, and Lilian Ileto. Lilian Ileto, Joseph Ileto's mother, also asserted survival and wrongful death claims. As we explain below, because those claims incorporate the negligence and nuisance claims, the analysis with respect to these claims applies to Lilian Ileto's survival and wrongful death claims.

2. Defendants Maadi, an Egyptian business, and Imbel, a Brazilian business, never appeared in the district court. The district court docket does not reflect that these defendants were served with the summons and

## I. FACTS AND PROCEDURAL BACKGROUND[3]

On August 10, 1999, Furrow approached the North Valley JCC in Granada Hills, California, carrying firearms manufactured, marketed, imported, distributed, and/or sold by the defendants named in this case. When Furrow purchased these guns and at the time of the shooting, federal law prohibited him from possessing, purchasing, or using any firearm.[4] Furrow allegedly had at least the following guns in his possession: Glock Inc's ("Glock's") model 26, a 9mm handgun; China North Industries Corp's ("Norinco's") model 320, a 9mm short-barreled rifle; Maadi's model RML, a 7.62 caliber automatic rifle; Bushmaster's model XM15 E25, a .223 caliber rifle; two of Imbel's model L1A1, a .308 caliber rifle; and Davis Industries' model D 22, a .22 caliber handgun.

Furrow entered the JCC with this arsenal and proceeded to shoot and injure three young children, one teenager, and one adult with his Glock gun. Two of the young children were plaintiffs Joshua Stepakoff ("Stepakoff"), who was six years old at the time of the shooting, and Benjamin Kadish ("Kadish"), who was five years old at the time of the shooting. Stepakoff was shot twice in the left lower leg and left hip, fracturing a bone. Kadish was shot twice in the buttocks and left leg, fracturing his left femur, severing an artery, and causing major internal injuries. Plaintiff Mindy Finkelstein ("Finkelstein"), a sixteen-year old camp counselor, was shot twice in her right leg. Plaintiff Nathan Powers ("Powers"), a four year-old boy, was not shot, but witnessed and experienced the shootings. The shootings terrified and shocked him, causing him to suffer great mental suffering, anguish, and anxiety as well as severe shock to his nervous system. He suffered severe emotional distress as a result.

Furrow then fled the JCC with the firearms, and came upon Ileto, a United States Postal Service worker, who was delivering mail in Chatsworth, California. Furrow shot and killed Ileto with his Norinco gun. Nine millimeter bullet casings were recovered at both crime scenes. The Norinco and the Glock guns in Furrow's possession were chambered for 9mm ammunition.[5]

complaint in this action. These defendants therefore are not parties to this appeal.

3. Because the district court dismissed the plaintiffs' case pursuant to Rule 12(b)(6) dismissal for failure to state a claim, we must "accept as true all well-pleaded allegations of fact in the complaint and constru[e] them in the light most favorable to the plaintiffs." Thus, this factual recitation is taken from the plaintiffs' First Amended Complaint ("FAC").

4. Furrow had been committed to a psychiatric hospital in 1998, indicted for a felony in 1998, and convicted of assault in the second degree in 1999 in the state of Washington. Federal law prohibits a person with a mental defect who has been committed to a mental institution and/or convicted of a felony from purchasing a gun. This prohibition is contained in 18 U.S.C. § 922(d), which provides in pertinent part:

It shall be unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person—

(1) is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

(2) is a fugitive from justice;

(3) is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));

(4) has been adjudicated as a mental defective or has been committed to any mental institution . . .

5. The FAC states that the Norinco, the Glock, and the Davis guns were chambered with 9mm casings. However, in an errata filed after the FAC, plaintiffs noted that only the Glock and the Norinco guns actually were chambered for 9mm ammunition.

In their initial complaint, the plaintiffs alleged five causes of action. Lilian Ileto also asserted two claims against all defendants for survival and wrongful death. The last five claims were brought by all plaintiffs against all defendants [6] for public nuisance, negligence, negligent entrustment, and unfair business practices. The original complaint sought certification of a class, damages, and injunctive relief.

On May 23, 2001, the plaintiffs filed their thirty-seven page FAC, retaining Lilian Ileto's survival and wrongful death claims as well as all plaintiffs' negligence and public nuisance claims, and the claim for damages. Plaintiffs abandoned their class allegations and their requests for injunctive relief, and dropped defendants Loaner Pawnshop and David McGee from the complaint. RSR Management Corporation and RSR Wholesale Guns Seattle, Inc. (collectively, "RSR") were named as two of the Doe defendants. Norinco removed the action to federal court pursuant to 28 U.S.C. §§ 1330 and 1603 on the ground that Norinco is an instrumentality of a foreign state.

In the FAC, plaintiffs asserted a number of claims against the manufacturers, distributors, and dealers of the guns Furrow carried with him on the day of the shootings. Defendants moved to dismiss the case, arguing that even if all of the alleged facts were true, the plaintiffs had failed to state a legally cognizable claim; the district court agreed and granted the motions to dismiss. On appeal, the plaintiffs pursue only two of their original claims, the negligence and public nuisance claims. Below, we set forth the core allegations with respect to these claims.

A. FACTS ALLEGED IN THE NEGLIGENCE CLAIM

The first three claims in Count IV include general claims against all defendants, alleging that their "deliberate and reckless marketing strategies caused their firearms to be distributed and obtained by Furrow resulting in injury and death to plaintiffs." Plaintiffs also allege that the defendants intentionally produced more firearms than the legitimate market demands with the intent of marketing their firearms to illegal purchasers who buy guns on the secondary market. The plaintiffs also allege that the defendants breached their legal duty to the plaintiffs "through their knowing, intentional, reckless, and negligent conduct ... foreseeably and proximately causing] injury, emotional distress, and death to plaintiffs."

Plaintiffs allege that each of the firearms used by Furrow (the one allegedly used at the JCC, the one used to kill Ileto, and the ones not necessarily fired but carried by Furrow in his arsenal on the day of the shootings)

> were marketed, distributed, imported, promoted, or sold by each of the defendants in the high-risk, crime-facilitating manner and circumstances described herein, including gun shows, 'kitchen table' dealers, pawn shops, multiple sales, straw purchases, faux 'collectors,' and distributors, dealers and purchasers whose ATF crime-trace records or other information defendants knew or should have known identify them as high-risk. Defendants' practices knowingly facilitate easy access to their deadly products by people like Furrow.

> With respect to Glock, plaintiffs specifically alleged that Glock targets its firearms to law enforcement first to gain credibility and then uses the enhanced value that comes with law enforcement use to increase gun sales in the civilian market.

---

**6.** Two defendants, Loaner Pawnshop and David McGee, successfully moved for dismissal for lack of personal jurisdiction.

They contend that Glock guns are safe and appropriate for use by well trained elite offensive police forces, but are not appropriate for civilians or unskilled users. In addition, Glock and its distributors encourage police departments to make trade-ins earlier than necessary or originally planned so that they can sell more firearms to the police and sell the former police guns at a mark-up on the civilian market. Glock knows that by over-saturating the market with guns, the guns will go to the secondary markets that serve illegal purchasers.

The gun that Furrow used to shoot and kill Ileto was purchased originally by a police department in the state of Washington. The plaintiffs allege that Glock and its distributor, RSR Seattle, arranged for the sale of the gun to the police department and its subsequent sale to gun dealers to facilitate the creation of an illegal secondary gun market. The gun was initially shipped to the Cosmopolis Police Department in Washington State along with another gun of the same model. Within one week, the police department determined that the guns were too small to fit into a large person's hand and decided to exchange the guns for another Glock model. The Cosmopolis Police Department contacted a former Police reserve officer, Don Dineen ("Dineen"), who had a gun store in Cosmopolis, to complete the exchange. Dineen contacted RSR Seattle, a Glock distributor, to request two new Glock guns for a trade with the Cosmopolis Police Department. RSR shipped the two guns to Dineen and agreed that payment did not have to be made for the new guns until Dineen was able to sell the former police guns. In a transaction with the police department, Dineen exchanged the two new Glock guns for the two Glock guns rejected by the Department at no cost to the Department. Dineen then was able to sell one of the former Police Department Glock guns at a reduced price to David Wright, a man who claimed to be a gun collector.

Dineen had introduced Wright to another "gun collector"[7] named Andrew Palmer, knowing that neither Wright nor Palmer had firearms licenses, and therefore that they did not have to obtain background checks on their purchasers. Dineen also knew that Wright and Palmer frequently sold and traded guns at gun shows in Spokane, Washington, which is near Hayden Lake, Idaho, the home of the Aryan Nations and the Neo Nazi group of which Furrow was a member. Indeed, Wright sold the Glock gun to Palmer at a gun show in Spokane, Washington; at this same gun show, it is alleged that Furrow purchased the Glock gun used in the JCC shootings from Palmer.

Plaintiffs alleged that all the defendant gun manufacturers and distributors produce, distribute, and sell more firearms than legal purchasers can buy, and that they all "knowingly participate in and facilitate the secondary market where persons who are illegal purchasers and have injurious intent obtain their firearms." Furthermore, the plaintiffs allege that the defendant manufacturers and distributors "select and develop distribution channels they know regularly provide guns to criminals and underage end users. Defendant manufacturers and distributors have been specifically so informed [by the ATF[8]] in

7. The Complaint alleges that these "gun collectors" do not actually collect guns for any purpose other than to sell them without having to comply with the firearm registration system and background checks with which gun store owners must comply with when they sell a gun.

8. The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is a law enforcement

connection with [its] crime-gun trac[ing] efforts[.]" Despite this knowledge and information documenting the path of guns to illegal purchasers, the defendant manufacturers and distributors fail to exercise reasonable care to protect the public from the risks created by the distribution and marketing schemes that create an illegal secondary market. Defendants' contracts with their distributors and dealers, and the defendant distributors' contracts with their dealers do not include provisions to address the risks associated with prohibited purchasers. Defendants gain significant revenue from the illegal secondary gun market and therefore fail to adopt the most basic policies and practices that would help to decrease greatly the number of guns reaching prohibited purchasers.

Plaintiffs further alleged that the defendants create and control the distribution channels that provided Furrow, an illegal purchaser and user, with the firearms he used to kill Ileto and to injure the other victims. Defendants knew which distributors and dealers provided guns to illegal purchasers. Defendants knew that their negligent conduct created an unreasonable risk of harm to people like the plaintiffs and that the subsequent creation of an illegal secondary gun markets was a substantial factor contributing to the injuries the plaintiffs suffered. Finally, plaintiffs alleged damages for "numerous compensable injuries suffered by plaintiffs[that] include but are not limited to personal injury, death, pain and suffering, severe emotional distress, lost companionship, medical expenses, and lost income."

## B. FACTS ALLEGED IN THE NUISANCE CLAIM

Plaintiffs also allege that the defendants' marketing and distribution policies "knowingly created and maintained an unreasonable interference with rights common to the general public, constituting a public

nuisance under California law." Plaintiffs allege that defendants

market, distribute, promote, and sell firearms, a lethal product, with reckless disregard for human life and for the peace, tranquility, and economic well being of the public. They have knowingly created, facilitated, and maintained an over-saturated firearms market that makes firearms easily available to anyone intent on crime. The particular firearms used in these incidents were marketed, distributed, imported, promoted, and sold by defendants in the manner set out herein, which defendants knew or should have known facilitates and encourages easy access by persons intent on murder, mayhem, or other crimes, including illegal purchasers such as Furrow. Their conduct has thereby created and contributed to a public nuisance by unreasonably interfering with public safety and health and undermining California's gun laws, and it has resulted in the specific and particularized injuries suffered by plaintiffs.

Although defendants knew about precautions they could have taken to decrease access by prohibited purchasers of their products, they "knowingly establish[ed], suppl[ied], and maintain[ed] an over-saturated firearms market that facilitates easy access for criminal purposes, including access by persons prohibited to purchase or possess firearms under state or federal law." Defendants' actions make the public vulnerable to crime and assault and their conduct "obstructs the free passage or use ... of the public parks, squares, streets, and highways within the meaning of California Penal Code § 370." As alleged in the FAC, the defendants' interference with rights common to the public is unreasonable and constitutes a nuisance because:

It significantly interferes with the public safety, health or peace. This interfer-

agency within the United States Department of Justice.

ence is not insubstantial or fleeting, but rather involves a disruption of public peace and order in that it adversely affects the fabric and viability of the entire community, and a substantial number of persons, within the meaning of California Civil Code § 3480....

It is continuing conduct, and it has produced a permanent or long-lasting effect, and defendants know or have reason to know that it has a significant effect upon the public right. Defendants continually engage in their reckless conduct even though they are continually informed of the resulting substantial, permanent, and long-lasting harm and even as they receive daily notice from the ATF of the distribution channels they use that are doing the most harm. Defendants have reason to know-and actually know [—] of the disastrous, continuing, and long-lasting effects of their conduct on the public....

Though not necessarily proscribed per se by law, defendants' conduct nevertheless undermines state and federal law restricting gun sales and possession and renders enforcement of such laws difficult or impossible. In this sense, defendants' interference with a common public right is contrary to public policy as established by state and federal law, and the interference is therefore unreasonable.

Plaintiffs seek damages for injuries they suffered as a result of defendants' creation of a public nuisance.

## C. District Court Dismissal and Plaintiffs' Claims of Negligence and Public Nuisance

Defendants Republic Arms, Inc., Jimmy L. Davis and Davis Industries (collectively,

"Davis"), Quality Parts Company and Bushmaster Firearms ("Bushmaster"), RSR, Norinco, and Glock all filed motions to dismiss under Fed.R.Civ.P. 12(b)(6). In a published memorandum order, the district court granted the motions to dismiss. *See Ileto v. Glock, Inc.,* 194 F.Supp.2d 1040 (C.D.Cal.2002). The district court directed entry of a final judgment in favor of all moving defendants pursuant to Fed. R.Civ.P. 54(b).

On appeal, plaintiffs maintain that on the basis of the allegations stated in the FAC, they have demonstrated that all defendants, including those who manufactured and distributed the guns that Furrow fired and the guns that he carried in his arsenal during the shootings, created a secondary market targeting illegal purchasers and promoted their products as necessary for self protection. Plaintiffs argue that defendants failed to take even minimal precautions to prevent or diminish the criminal market.[9] Plaintiffs argue that defendants created this illegal secondary market and promoted it despite the knowledge that as a result of this distribution scheme, it was reasonably foreseeable that individuals like the plaintiffs here and the public at large would be harmed. As we discuss below, taking the allegations in the FAC as true for purposes of review of a Rule 12(b)(6) dismissal, we conclude that the plaintiffs sufficiently have alleged claims for relief for negligence and public nuisance.

## II. Standard of Review

We review *de novo* a dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *Kirtley v. Rainey,* 326 F.3d 1088, 1092 (9th Cir. 2003). Rule 12(b)(6), which tests the legal

---

**9.** It should be noted that plaintiffs do not allege that the creation of *any* secondary market is a criminal market-only those markets that sell to prohibited purchasers, like Furrow, are alleged to be criminal secondary markets.

sufficiency of the claims asserted in the complaint, must be read in conjunction with Rule 8, which requires a "short and plain statement showing that the pleader is entitled to relief" and "contains a powerful presumption against rejecting pleadings for failure to state a claim." *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 248–49 (9th Cir.1997) (internal citation omitted). We must take "all well-pleaded allegations of material fact as true and construe them in the light most favorable to the plaintiff." *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1021 (9th Cir.2000).

We also must consider all inferences favoring the non-moving party that a trier of fact could reasonably draw from the evidence. *See Zimmerman v. City of Oakland*, 255 F.3d 734, 737 (9th Cir.2001). However, we do not accept any unreasonable inferences or assume the truth of legal conclusions cast in the form of factual allegations. *See Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.1981).[10] Because we are sitting in diversity, and there are no supreme court or appellate court decisions in California that have addressed the specific claims alleged by the plaintiffs, we must attempt to determine how the California Supreme Court might decide the issue. *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir.1992).

## III. ANALYSIS: GENERAL ALLEGATIONS AGAINST DEFENDANTS

In *Merrill v. Navegar*, the California Supreme Court rejected a negligent design claim in the context of a product liabilities action, but the court never has addressed a negligent distribution or marketing claim. 26 Cal.4th 465, 110 Cal.Rptr.2d 370, 28 P.3d 116 (2001).[11] When the district court in the present case dismissed the negligence claim, it concluded that the claims before it were distinguishable from the design claims in *Merrill*. We agree that these claims are distinct from the ones raised in *Merrill*. Although *Merrill* involved allegations of negligence in gun marketing, selling, and manufacturing, "[t]he Merrill plaintiffs alleged that the defendant was negligent in 'releasing the weapons for sale to the general public even though it knew or should have known that the TEC 9 was particularly attractive to criminals and particularly suited for mass killings.'" *Ileto*, 194 F.Supp.2d at 1051 (quoting *Merrill*, 110 Cal.Rptr.2d 370, 28 P.3d at 121). As the district court noted, in *Merrill*, "even the negligent sale claim

**10.** We note that these allegations are similar to allegations in other cases where other state courts and a federal district court have denied motions to dismiss. See discussion, *infra* at 1206–1207, 1214. We conclude as these other courts do that the facts as alleged do not require any unreasonable inferences and therefore accept them as true on review of the district court's dismissal of these claims.

**11.** In *Merrill*, the California Supreme Court held that, although the plaintiffs characterized their action as a negligence claim, it was in reality a products liability action and therefore barred by then-existing California Civil Code section 1714.4, which barred gun manufacturers from liability in a products liability action. *Merrill*, 110 Cal.Rptr.2d 370, 28 P.3d at 119. Thus, although the *Merrill* plaintiffs presented a negligent marketing claim, that claim, like the others, was actually a part of the plaintiffs' underlying defective design claim and was therefore dismissed. Plaintiffs alleged the marketing was negligent because it was marketing a defective product. The *Merrill* court noted that the plaintiffs themselves acknowledged that the marketing claim was "immaterial" to causation. According to the *Merrill* court, the plaintiffs argued: "[T]he ordinary negligence claim is directed to Navegar's conduct in making the TEC 9 available to the public. It is that unreasonable conduct that was a substantial factor in causing plaintiffs' injuries, not Navegar's marketing efforts." Id. at 122. Thus, contrary to the dissent's conclusion with respect to the marketing claim in *Merrill*, the California Supreme Court has yet to address the type of negligent distribution claim presented here.

was based on the dangerous design of the particular firearm at issue. Additionally, the *Merrill* plaintiffs claimed that the defendant was negligent in selling the firearm generally, rather than through crime-prone distribution channels." *Id.*

The California Supreme Court concluded in no uncertain terms that the *Merrill* plaintiffs presented a negligent products liability action, and that the plaintiffs' attempts to disguise their products liability claim by avoiding the use of the word "defect" was an unsuccessful attempt to mischaracterize the true nature of the suit. *Merrill*, 110 Cal.Rptr.2d 370, 28 P.3d at 126. In *Merrill*, distribution claims did not stand alone; references to "distribution" were to distribution of a defective product. Here, as the district court emphasized, "Plaintiffs ... do not allege that Glock is negligent in distributing its firearms to the general public. Rather, they contend that Glock's distribution scheme specifically targets criminal users." *Ileto*, 194 F.Supp.2d at 1051. Unlike the *Merrill* plaintiffs, who alleged that the gun manufacturers' decision to distribute the guns in question to the general public was negligent in light of the guns' alleged defective design features and therefore was "simply a reformulated claim that the weapon, as designed, fails the risk/benefit [products liability] test," *Merrill*, 110 Cal.Rptr.2d 370, 28 P.3d at 126, here plaintiffs focus on the negligent distribution of a non-defective product. The focus is on the defendants' affirmative actions in distributing their products to create an illegal secondary market for guns that targets illegal purchasers.

Contrary to the dissent's mis-characterization of this case as a products liability suit, this is an action that alleges negligence and public nuisance claims; it does not allege that the guns in question were defectively designed or manufactured or that the defendants failed to affix an adequate warning on the guns. *See Barker v. Lull Eng'g Co.* 20 Cal.3d 413, 428, 143 Cal.Rptr. 225, 573 P.2d 443 (1978) (citing the "numerous product liability precedents in California" that describe three basic categories of cases: manufacturing defects, design defects, and inadequate warnings). Thus, the dissent's reliance on *Stevens v. Parke, Davis, & Co.*, 9 Cal.3d 51, 107 Cal.Rptr. 45, 507 P.2d 653 (1973), a case in which the California Supreme Court upheld a jury's verdict finding that the drug manufacturer "was negligent in that it failed to provide an adequate warning to the medical profession as to the dangers of [the drug in question] and it so overpromoted [the drug] as to cause [the deceased's doctor] to prescribe the drug," *Id.* at 64, 107 Cal.Rptr. 45, 507 P.2d 653, to demonstrate that California courts would treat the current action as a products liability action is misplaced. The over-promotion claim in *Stevens* was dependent on the underlying traditional products liability claim of inadequate warnings. "Although the manufacturer or supplier of a prescription drug has a duty to adequately warn the medical profession of its dangerous properties or of facts which make it likely to be dangerous, an adequate warning to the profession may be eroded or even nullified by overpromotion of the drug through a vigorous sales program which may have the effect of persuading the prescribing doctor to disregard the warnings given." *Id.* at 65, 107 Cal.Rptr. 45, 507 P.2d 653.

In the present case, there is no such underlying products liability issue—the plaintiffs acknowledge that the products were not defective and that they did not lack necessary warnings. Rather, plaintiffs allege that through their distribution scheme, defendants created an illegal secondary market for guns targeted at illegal users. Thus, the California Supreme Court's citation in *Stevens* to the Restatement (Second) of Torts § 388, which, as

the dissent acknowledges, is a section of the Restatement that addresses a theory of products liability on the basis of failure to warn, provides no indication that in light of plaintiffs' allegations, the California Supreme Court would treat plaintiffs' negligent distribution claim as one for products liability.

We also conclude that there was no statutory bar to a negligent distribution or nuisance claim at the time the case was filed (nor is there a bar today). Until January 2003, California Civil Code section 1714.4 read as follows:

> (a) *In a products liability action,* no firearm or ammunition shall be deemed defective in design on the basis that the benefits of the product do not outweigh the risk of injury posed by its potential to cause serious injury, damage, or death when discharged.
>
> (b) *For purposes of this section:*
>
> (1) The potential of a firearm or ammunition to cause serious injury, damage, or death when discharged does not make the product defective in design.
>
> (2) Injuries or damages resulting from the discharge of a firearm or ammuni-

tion are not proximately caused by its potential to cause serious injury, damage, or death, but are proximately caused by the actual discharge of the product.

Cal. Civ.Code section 1714.4 (repealed in 2002) (emphasis added) [12]

As the district court noted, "section 1714.4 does not by its terms bar the negligence action." *Ileto,* 194 F.Supp.2d at 1050. Indeed, the text of the section is carefully limited to products liability actions. As explained above, unlike *Merrill,* this case is not a products liability case reframed as a negligence case, but rather it is a classic negligence and nuisance case. Thus, although section 1714.4 was in force at the time of the shootings and at the time that the complaint was filed, it did not affect this action. [13]

In order to determine the existence and scope of duty, "we begin always with the command of ... section 1714, subdivision (a): 'Everyone is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person ...' " [14] *Merrill,*

---

12. The California legislature repealed section 1714.4 shortly after the California Supreme Court issued its decision in *Merrill v. Navegar.* According to many commentators, the California legislature's repeal of section 1714.4 was in direct response to the *Merrill* decision. *See* Emily Kromke, Note, *California's Legislative Response to Merrill v. Navegar: An Analysis,* 24 Whittier L.Rev. 833, 834 (2003) ("The *Merrill* court was unable to find gun manufacturers liable ... due to California Civil Code section 1714.4. As a result, the California legislature decided to change the law to allow gun and ammunition manufacturers to be sued on product defect actions as well as negligence actions.").

13. The dissent cites California Civil Code section 1714.4(b) to support its argument that "California law unequivocally states that the injuries and damages here were proximately caused by Buford Furrow." This conclusion

only follows, as the dissent acknowledges, "[o]nce ... section 1714.4 [applies]." As we explained and as the district court concluded, plaintiffs' claim does not fall under this section because it is not premised on a theory of products liability. Rather, here plaintiffs contend that the defendants' actions in the creation of an illegal secondary market targeting prohibited purchasers were negligent and constituted a public nuisance—plaintiffs never alleged that the guns in Furrow's possession were defective. Plaintiffs' allegations focus on defendants' distribution scheme.

14. The repeal of section 1714.4 coincided in 2002 with the amendment of section 1714, when the California legislature added the following text to section 1714(a): "The design, distribution, or marketing of firearms and ammunition is not exempt from the duty to use ordinary care and skill that is required by this section ..."

110 Cal.Rptr.2d 370, 28 P.3d at 123 (quoting *Christensen v. Superior Court*, 820 P.2d 181, 189 (Cal.1991)). In *Rowland v. Christian*, the California Supreme Court explained that

[a] departure from this fundamental principle involves the balancing of a number of considerations, the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561, 564 (1968) (superseded by statute as stated in *Perez v. S. Pac. Transp. Co.*, 218 Cal.App.3d 462, 467, 267 Cal.Rptr. 100 (1990)). *See also Merrill*, 110 Cal.Rptr.2d 370, 28 P.3d at 124 (restating the same criteria for exceptions from the rule set forth in section 1714).

Defendants argue that an application of these criteria—especially the connection between the defendants' conduct and the injury suffered—results in the conclusion that no duty arises. However, as explained below, the plaintiffs sufficiently have alleged that it was reasonably foreseeable that defendants' actions were likely to result in the kind of harm experienced by the plaintiffs. Furthermore, plaintiffs have alleged with specificity the link between the manufacturers' and distributors' negligent behavior and the harm suffered. Because several of the defendants are situated differently, we address separately the claims against each individual defendant. However, where all defendants make the same argument, we refer to them collectively as defendants' argu-

ments. Similarly, where the plaintiffs make allegations that apply to all defendants we refer to allegations against "defendants," including Glock and the other individual defendants. We begin with Glock, and then analyze the claims against Norinco, RSR, Bushmaster, and Davis.

**A. PLAINTIFFS STATE A CLAIM FOR NEGLIGENCE**

█ In order to establish negligence under California law, a plaintiff must establish four required elements: (1) duty; (2) breach; (3) causation; and (4) damages. *See Martinez v. Pacific Bell*, 225 Cal. App.3d 1557, 275 Cal.Rptr. 878, 883 (1990); *see also* 6 Witkin, Summary of Cal. Law, Torts § 732, at 60–61 (9th ed.1988).

**1. GLOCK OWES PLAINTIFFS A DUTY OF CARE**

█ Whether a legal duty arises "is a question of law which is simply an expression of the sum total of the policy considerations that lead a court to conclude that a particular plaintiff is entitled to protection." *Jacoves v. United Merchandising Corp.*, 9 Cal.App.4th 88, 11 Cal.Rptr.2d 468, 484 (1992); *see also Ballard v. Uribe*, 41 Cal.3d 564, 224 Cal.Rptr. 664, 715 P.2d 624, 629 n. 9 (1986). A critical part of the determination of whether a particular plaintiff is entitled to protection is whether she is "foreseeably endangered by defendant's conduct." *Jacoves*, 11 Cal.Rptr.2d at 484. The California Supreme Court has explained that the legal duty to exercise due care so as not to create an "unreasonable risk of injury to others" extends to the "class of persons who it is reasonably foreseeable may be injured as the result of the actor's conduct[.]" *Lugtu v. California Highway Patrol*, 26 Cal.4th 703, 110 Cal.Rptr.2d 528, 28 P.3d 249, 256 (2001). The court continued, "[i]t is well established, moreover, that one's general duty to exercise due care includes the duty not

to place another person in a situation in which the other person is exposed to an unreasonable risk of harm through the reasonably foreseeable conduct (including the reasonably foreseeable negligent conduct) of a third person." *Id.*

■■■ Although whether a duty exists is a question of law, foreseeability often is a question left for the jury to decide.[15] The allegations here that the defendants created an illegal secondary firearms market that was intentionally directed at supplying guns to prohibited gun purchasers like Furrow are more than sufficient to raise a factual question as to whether the defendants owed the plaintiffs a duty of care and whether the defendants breached that duty. As the California Supreme Court has stated, a defendant's duty of care extends to those individuals a defendant puts at an unreasonable risk of harm through the reasonably foreseeable actions of a third party. *Id.* Here, plaintiffs. have alleged sufficient facts for a reasonable jury to conclude that through their distribution practices, defendants have created an illegal secondary market targeting prohibited purchasers that placed plaintiffs in a situation in which they were exposed to an unreasonable risk of harm through the reasonably foreseeable conduct of a prohibited purchaser like Furrow.

Defendants point to the district court's conclusion that the "harm to these Plaintiffs was not foreseeable. While it might be foreseeable that some criminals might obtain Glock firearms and use them to harm others, there was no way of foreseeing that this particular individual (Furrow) would obtain a Glock firearm and use it to injure these Plaintiffs." *Ileto,* 194 F.Supp.2d at 1053. However, the California Supreme Court has rejected a definition of foreseeability that requires identify-ing whether an individual plaintiff's injury was foreseeable in light of a particular defendant's conduct, and instead has adopted a broader categorical approach:

> The foreseeability of a particular kind of harm plays a very significant role in this calculus, but a court's task—in determining duty—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party. The jury, by contrast, considers "foreseeability" in two more focused, fact-specific settings. First, the jury may consider the likelihood or foreseeability of injury in determining whether, in fact, the particular defendant's conduct was negligent in the first place. Second, foreseeability may be relevant to the jury's determination of whether the defendant's negligence was a proximate or legal cause of the plaintiff's injury.

*Ballard,* 224 Cal.Rptr. 664, 715 P.2d at 629 n. 6 (citations omitted).

Here, plaintiffs allegations in the FAC meet the foreseeability requirements for establishing a duty and a breach of that duty. Plaintiffs allege that Glock's marketing and distribution strategy includes the purposeful oversupply of guns to police departments and the provision of unnecessary upgrades and free exchange of guns with police departments to create a supply of post-police guns that can be sold through unlicensed dealers without background checks to illegal buyers at a profit. Glock allegedly targets states like Washington, where the gun laws are less strict

---

**15.** Whether a plaintiff is foreseeably endangered by a defendant's conduct is a question of fact, but it is often a "part of the calculus to which a court looks in defining the boundaries of 'duty.'" *Ballard,* 224 Cal.Rptr. 664, 715 P.2d at 629 n. 6.

than in California, in order to increase sales to all buyers, including illegal purchasers, who will take their guns into neighboring California. The ATF has provided Glock with the names of the distributors who are responsible for the sales of guns that end up in the hands of criminals, but Glock has ignored the information and continues to supply these same distributors.

It is reasonably foreseeable that this negligent behavior and distribution strategy will result in guns getting into the hands of people like Furrow who are forbidden by federal and state law from purchasing a weapon. It also is reasonably foreseeable that once these prohibited purchasers obtain the firearms, they will use them for criminal activity; Congress and the California Legislature intended to prevent buyers like Furrow, who have histories of mental illness and felony convictions, from purchasing guns in part because they understood that such individuals with guns are likely to use them to shoot innocent victims. Furthermore, the kind of harm suffered (death, serious gun shot wounds, and trauma from witnessing gun violence) is the kind of harm that is reasonably foreseeable when a person who is forbidden under federal law from purchasing guns is able to purchase an arsenal as a result of the manufacturer's distribution system.

■ "In determining whether defendant breached a duty of care owed to plaintiff, the magnitude of the harm likely to result from [a] defendant's conduct must be balanced against the social value of the interest which he is seeking to advance, and the ease with which he may take precautions to avoid the risk of harm to plaintiff." *Musgrove v. Ambrose Properties*, 87 Cal. App.3d 44, 150 Cal.Rptr. 722, 726 (1978). The social value of the interest defendants seek to advance and the ease with which they could take readily available precautions weigh in favor of finding a breach of duty. First, plaintiffs alleged that the ATF provided manufacturers detailed reports of the distributors, dealers, and gun shows that consistently supply the guns used in crimes. Plaintiffs further alleged that the defendant manufacturers and distributors failed to utilize distribution techniques that were commonly used by other businesses to avoid distribution to illegal end users. Furthermore, the plaintiffs alleged that Glock and other defendant manufacturers negotiate contracts with distributors (including RSR) and dealers that do not include basic provisions to address the risk of acquisition of firearms by prohibited purchasers despite the fact that other forms of incentive provisions regularly were included in the contracts. According to plaintiffs, the defendants also fail to utilize basic training instruction that would help dealers and distributors recognize straw buyers or avoid distribution to illegal purchasers.

The social value of manufacturing and distributing guns without taking basic steps to prevent these guns from reaching illegal purchasers and possessors [16] cannot outweigh the public interest in keeping guns out of the hands of illegal purchasers and possessors who in turn use them in crimes like the one that prompted plaintiffs' action here.[17] The debate over the social value of guns generally need not

---

**16.** As noted above, federal law prohibits individuals who have been convicted of a felony and/or have a mental defect or have been institutionalized for mental illness from purchasing *or* possessing firearms.

**17.** Because the dissent mis-characterizes plaintiffs' claims as products liability claims,

it contends that this weighing "will require 'a jury ... to do precisely what section 1714.4 prohibits: weigh the risks and benefits of a particular firearm," Dissent, p. 1221, quoting *Merrill*, 26 Cal.4th at 486. Again, section

enter this case; rather, we must limit our evaluation to the social value of the defendants' interest in distributing the guns in a manner alleged in the FAC as "designed to facilitate and encourage easy access by prohibited persons, such as Furrow" when the defendants have the knowledge and the means to distribute guns in a manner that would reduce the risk of access and use by prohibited persons. We conclude that the social value of this practice to the defendants is outweighed by the health and safety interests of potential victims of gun violence at the hands of prohibited purchasers.

In sum, we conclude that the allegations in the FAC, which we must accept as true on review of a Rule 12(b)(6) dismissal, are sufficient to impose a duty of care on defendants.

### 2. THIRD PARTIES, CAUSATION AND "LIMITLESS LIABILITY"

 "To establish liability in negligence, it is a fundamental principle of tort law that there must be a legal duty owed to the person injured and a breach of that duty which is the proximate [18] cause of the resulting injury." *Jacoves,* 11 Cal.Rptr.2d at 484. Proximate cause "limits the defendant's liability to those foreseeable consequences that the defendant's negligence was a substantial factor in producing." *Mendoza v. City of Los Angeles,* 66 Cal. App.4th 1333, 78 Cal.Rptr.2d 525, 530 (1998). Whether an act is the proximate cause of injury is generally a question of

fact; it "is a question of law where the facts are uncontroverted and only one deduction or inference may reasonably be drawn from those facts." *Garman v. Magic Chef, Inc.,* 117 Cal.App.3d 634, 173 Cal.Rptr. 20, 22 (1981).

Defendants point to a New York Court of Appeals decision holding that no duty existed between a gun manufacturer and victims of a shooting. In its decision, the New York state court concluded that, when there is a third party involved, such as the shooter, a duty may arise between the manufacturer and the victim-plaintiffs but only when there is some form of a special relationship between the third person tortfeasor or between the defendants and the plaintiffs. *See Hamilton v. Beretta USA Corp.,* 96 N.Y.2d 222, 727 N.Y.S.2d 7, 750 N.E.2d 1055, 1061 (2001). However, the present case is distinguishable because the FAC does sufficiently allege a direct link between the manufacturers distribution practices and the illegal sale of the Glock gun to Furrow that he used to kill Ileto. Furthermore, California courts apply a "substantial factor" test to determine proximate cause. The traditional notion of "but for" causation is subsumed within the substantial factor test, whereby defendants' actions may be the proximate cause of a plaintiff's injuries if those actions were a substantial factor in bringing them about. *See Mitchell v. Gonzales,* 54 Cal.3d 1041, 1 Cal.Rptr.2d 913, 819 P.2d 872, 878 (1991). The links alleged in the FAC are not too attenuated to meet this standard.[19]

---

1714.4 is inapposite here; the weighing described here is the weighing required by clearly established California state law for purposes of determining whether a duty of care is owed to a plaintiff. *See, e.g., Musgrove,* 150 Cal.Rptr. at 726.

**18.** Although the California Supreme Court has noted a preference for the use of the term "legal" causation rather than "proximate" causation, see *Mitchell v. Gonzales,* 54 Cal.3d 1041, 1 Cal.Rptr.2d 913, 819 P.2d 872, 879

(1991), California courts continue to use the terms interchangeably. It is clear, however, as stated in the text, that whether using the term legal or proximate to modify causation, California courts incorporate the substantial factor test into the causation analysis. *See id.*

**19.** Additionally, despite the fact that a significant amount of time passed in between Glock's initial sale of the gun and Furrow's subsequent purchase and shooting, the creation of the illegal secondary market was on-

■ Here, Glock was in a position to prevent the harms alleged. "The key ... is that the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm." *Hamilton*, 727 N.Y.S.2d 7, 750 N.E.2d at 1061. Plaintiffs alleged that Glock knew which distributors sold guns that were later found to be purchased by prohibited buyers and used in crimes and that Glock's marketing and distribution system essentially targeted the gun show and unlicensed sales market where background checks are not required so that illegal purchasers could buy their guns. Glock knew which distribution channels were providing guns to illegal purchasers and was in a position to use the information the ATF made available to it to modify its distribution practices or to offer training to its distributors that would help them identify straw purchasers and purchasers who would in turn sell to illegal purchasers like Furrow.

The Ohio Supreme Court[20] recently permitted a suit by the City of Cincinnati against gun manufacturers, trade associations, and distributors to proceed in which the city alleged nuisance, negligence, and products liability claims for the harm caused by the firearms the defendants manufactured, sold, and distributed. *City of Cincinnati v. Beretta U.S.A. Corp.* 95 Ohio St.3d 416, 768 N.E.2d 1136 (2002). Rejecting the defendants' arguments that the harm was too attenuated and that they did not have a duty to control third parties, the Ohio Supreme Court explained that

the negligence issue before us is not whether appellees owe appellant a duty to control the conduct of third parties. Instead, the issue is whether appellees are themselves negligent by manufacturing, marketing, and distributing firearms in a way that creates an illegal firearms market that results in foreseeable injury. Consequently, the 'special relationship' rule is not determinative of the issue presented here. Instead, the allegations of the complaint are to be addressed without resort to that rule. *Id.* at 1144.

Similarly, the Ohio Supreme Court noted with approval a Massachusetts state court decision in which it recognized that "Plaintiffs do not allege that Defendants were negligent for failure to protect from harm but that Defendants engaged in conduct the foreseeable result of which was to cause harm to Plaintiffs." *Boston v. Smith & Wesson*, 12 Mass. L. Rptr. 225, 2000 WL 1473568, *15. Here,

[t]aking Plaintiffs' allegations as true, Defendants have engaged in affirmative acts (i.e., creating an illegal, secondary firearms market) by failing to exercise adequate control over the distribution of their firearms. Thus, it is affirmative conduct that is alleged—the creation of the illegal secondary firearms market. The method by which Defendants created this market, it is alleged, is by ... selling firearms without regard to the likelihood the firearms would be placed in the hands of juveniles, felons, or others not permitted to use firearms in Boston. Taken as true, these facts suffice to allege that Defendants' conduct unreasonably exposed Plaintiffs to a risk of harm. Worded differently, the Plaintiffs were, from Defendants' perspective,

going and "[p]roximity in point of time or space is no part of the definition" of proximate cause. *Osborn v. City of Whittier*, 103 Cal.App.2d 609, 230 P.2d 132, 136 (1951).

**20.** Like the California Supreme Court, the Ohio Supreme Court looks to the Restatement (Second) of Torts §§ 448 and 449 in determining whether a defendant may be liable for third party acts under a negligence theory of liability. *See Federal Steel & Wire Corp. v. Ruhlin Const. Co.*, 543 N.E.2d 769, 774–75 (Ohio 1989).

foreseeable plaintiffs. Thus, the court need not decide whether Defendants owed a duty greater than the basic duty. *Boston,* 2000 WL 1473568, at *15.

We also agree with the duty analysis of the district court for the Northern District of Ohio when it denied a Rule 12(b)(6) motion and allowed a city's negligence claims against gun manufacturers and sellers to proceed, explaining:

> [i]t cannot be said, as a matter of law, that Defendants are free from negligence because they do not owe Plaintiffs a duty of care. It is now, unfortunately, the common American experience that firearms in the hands of children or other unauthorized users can create grave injury to themselves and others, thus creating harm to municipalities through physical and economic injury. It is often for a jury to decide whether a plaintiff falls within the range of a duty of care and whether that duty was fulfilled . . .

*White v. Smith & Wesson,* 97 F.Supp.2d 816, 828–29 (N.D.Ohio 2000) [21]

In sum, here, it cannot be said that as a matter of law no duty was owed to the plaintiffs. On the contrary, under California negligence law, the plaintiffs' complaint alleged sufficient facts to permit a jury to conclude that Glock owed a duty to the plaintiffs, that the duty was breached, and that the breach was the proximate cause of those injuries.

### 3. INTERVENING ACT WAS FORESEEABLE

■ As a part of their argument that the link between the harm suffered by the plaintiffs and the actions of the defendants is too attenuated, Glock and the other defendants note that it was Furrow who shot the gun and that his wrongful act was the immediate cause of the injuries suffered by Ileto and the children at the JCC. However, the fact that there was an intervening act by Furrow is not fatal to the plaintiffs' claim on a Rule 12(b)(6) motion. To the contrary, under California law, where an intervening act by a third party was foreseeable, it does not amount to a superseding cause relieving the negligent defendant of liability. In *Landeros v. Flood,* an eleven year-old girl was taken into a hospital with several injuries suggesting that she had been physically abused. 17 Cal.3d 399, 131 Cal.Rptr. 69, 551 P.2d 389, 390 (1976). After treating the child for an unexplained broken ankle and other injuries, the treating doctor failed to report the child as a potential victim of child abuse. The child then suffered permanent injuries upon her return to her mother. *Id.* The California Supreme Court addressed the hospital's argument that, because the abuse was the immediate cause of the child's injury, its doctor's negligence could not be considered the proximate cause of the harm suffered by the child:

> Under the allegations of the complaint it is evident that the continued beating

---

**21.** The district court in Ohio premised this statement on a definition of the test for foreseeability that is markedly similar to the test used by California courts to define when an injury is foreseeable. *Compare White v. Smith & Wesson,* 97 F.Supp.2d 816, 828 (N.D.Ohio 2000) ("The test for foreseeability is whether a reasonably prudent person, under the same or similar circumstances as the defendant, should have anticipated that injury to the plaintiff or to those in like situations is the probable result of the performance or nonperformance of an act" (quoting *Commerce &*

*Industry Ins. Co. v. City of Toledo,* 45 Ohio St.3d 96, 543 N.E.2d 1188, 1192 (1989)), *with Bigbee v. Pacific Tel. & Tel. Co.,* 34 Cal.3d 49, 192 Cal.Rptr. 857, 665 P.2d 947, 952 (1983)) ("[Foreseeable injuries] include[ ] whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct . . . One may be held accountable for creating even the risk of a slight possibility of injury if a reasonably prudent [person] would not do so.") (internal citations omitted).

inflicted on Plaintiff by her mother and [the mother's husband] after she was released from the San Jose Hospital and returned to their custody constituted an 'intervening act' that was the immediate cause in fact of the injuries for which she seeks to recover. (Rest.2d Torts, section 441). It is well settled in this state, however, that an intervening act does not amount to a 'superseding cause' relieving the negligent defendant of liability if it was reasonably foreseeable: '[A]n actor may be liable if his negligence is a substantial factor in causing an injury, and he is not relieved of liability because of the intervening act of a third person if such act was reasonably foreseeable at the time of his negligent conduct'.

*Landeros*, 131 Cal.Rptr. 69, 551 P.2d at 395 (internal citations omitted).[22]

■■■ Plaintiffs have alleged that Glock knew that its distribution system and marketing policies would help to foster an illegal secondary gun market. This secondary market promotes illegal gun purchases by individuals who are forbidden by state and federal law from purchasing guns due to felony convictions or mental impairments. The law prohibits these individuals from purchasing and possessing firearms because lawmakers determined that they posed a greater risk of using the guns for illegal purposes. Thus, it was reasonably foreseeable that if Glock continued to foster the illegal secondary market, a person like Furrow who was prohibited by law from purchasing a gun would be able to purchase one and use the gun in the manner that was the basis for prohibiting such purchases in the first place.

Additionally, as the California Supreme Court has noted, under "section 449 of the Restatement Second of Torts … foreseeability may arise directly from the risk created by the original act of negligence: 'If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby.'" *Landeros*, 131 Cal.Rptr. 69, 551 P.2d at 395 (internal citations omitted).

In sum, under well-established California law, we hold that the plaintiffs have alleged sufficient facts, which if established by a preponderance of the evidence, would entitle them to relief.

## B. PUBLIC NUISANCE

"[A] principal office of the centuries-old doctrine of the 'public nuisance' has been the maintenance of public order—tranquility, security and protection—when the criminal law proves inadequate." *People ex rel. Gallo v. Acuna*, 14 Cal.4th 1090, 60 Cal.Rptr.2d 277, 929 P.2d 596, 603 (1997). Citing the Restatement (Second) of Torts § 821B (1979),[23] the California Supreme Court has identified five general categories of public rights that, when unreasonably interfered with, can give rise to a claim for a public nuisance: "the public health, the public safety, the public peace, the public comfort or the public convenience." *Id.* at 604. The California Supreme Court also

---

**22.** California courts have adopted the Restatement of Torts' treatment of whether a duty to foreseeable plaintiffs exists despite an intervening act in cases involving negligent acts by third parties, *see Mosley v. Arden Farms Co.*, 26 Cal.2d 213, 157 P.2d 372 (1945), as well as criminal acts by third parties, *see Richardson v. Ham*, 44 Cal.2d 772, 285 P.2d 269 (1955).

*See generally, Arden Farms* 157 P.2d at 375("It has been held that the rules on the subject in the Restatement of Torts sections 442–453, are applicable in this state.")

**23.** Unless otherwise noted, all citations to the Restatement (Second) of Torts are to the 1979 edition.

has recognized that California's early common law categories broadly define anything that is "injurious to health, ... or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway," as a nuisance. *Id.* (citing Cal. Civ. Code § 3479).

Generally, the Restatement (Second) of Torts reflects this broad interpretation of what constitutes a public nuisance.[24] The Restatement sets forth several circumstances under which interference with a public right may be deemed intentional and unreasonable and therefore give rise to liability for a public nuisance. The Restatement defines an intentional invasion of the public right as follows:

An invasion of another's interest in the use and enjoyment of land or an interference with the public right, is intentional if the actor

(a) acts for the purpose of causing it, or

(b) knows that it is resulting or is substantially certain to result from his conduct.

Restatement (Second) of Torts § 825.

Furthermore, the Restatement explains that whether interference with a public right is unreasonable should be determined by evaluating the following circumstances:

(a) Whether the conduct involves significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

Restatement (Second) of Torts § 821B(2).[25]

Here, the plaintiffs allege that Glock (and all of the other defendants) market, distribute, promote, and sell their products with reckless disregard for human life and for the peace, tranquility, and economic well being of the public. Furthermore, defendants have created a firearms market that is oversaturated and their conduct have unreasonably interfered with public safety and health. By their alleged actions, defendants have caused the specific and particularized injuries to the plaintiffs. Plaintiffs further allege that Glock's (and all of the defendants') actions are ongoing and that the defendants have actual knowl-

---

24. The California Supreme Court has essentially adopted the definition of public nuisance in the Restatement (Second) of Torts, describing the publication of the Restatement (Second) as "crystall[izing]" the law of public nuisance "to such an extent that its features could be clearly delineated" into the five general categories of public rights described above. *People ex rel. Gallo v. Acuna*, 14 Cal.4th 1090, 60 Cal.Rptr.2d 277, 929 P.2d 596, 604 (1997).

25. Note that these guidelines are connected by the disjunctive "or." *See also People ex rel.*

*Busch v. Projection Room Theater*, 17 Cal.3d 42, 130 Cal.Rptr. 328, 550 P.2d 600, 603–604 (1976) (noting the "substantial identity of definitions appearing in Penal Code sections 370 and 371, and Civil Code sections 3479 and 3480," and going on to restate Cal.Penal Code section 370 as broadly defining a public nuisance as "[a]nything which is injurious to health, or is indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property by an entire community or neighborhood, or by any considerable number of persons ...").

edge of the damaging impact of their distribution and marketing practices on the health, safety, and welfare of the California public.[26]

The plaintiffs have alleged that the distribution scheme developed by gun manufacturers and distributors including defendants have unreasonably interfered with various public rights including "the public health, the public safety, the public peace, the public comfort or the public convenience." *Acuna,* 60 Cal.Rptr.2d 277, 929 P.2d at 604. The California Supreme Court has adopted the Restatement of Torts's definition of a public right as one "common to all members of the general public. It is collective in nature[.]" *Id.* (quoting Restatement (Second) of Torts § 821B). Furthermore, the interference alleged here is "both substantial and unreasonable." *Id.* The California Supreme Court has looked to the Restatement of Torts to define the substantiality requirement in a public nuisance claim as proof of significant harm, harm that is "real and appreciable invasion of the plaintiff's interests," and is "definitely offensive, seriously annoying or intolerable." *Id.* at 605 (quoting Restatement (Second) of Torts § 821B). Facilitating the purchase of guns by individuals declared unfit to buy guns by the state and federal legislatures would qualify as "definitely offensive," and certainly more than "seriously annoying."

### 1. STANDING TO BRING THE PUBLIC NUISANCE CLAIM

The district court concluded that the majority of the plaintiffs had standing to bring a public nuisance claim. *Ileto,* 194 F.Supp.2d at 1057. Pursuant to California Civil Code section 3493, "[a] private person may maintain an action for a public nuisance, if it is specially injurious to himself, but not otherwise." Cal. Civ.Code § 3493. California courts generally have limited the group of plaintiffs with standing to sue on a public nuisance theory to plaintiffs who can "show special injury to himself of a character different in *kind*-not merely in degree-from that suffered by the general public." *Institoris v. City of Los Angeles,* 210 Cal.App.3d 10, 258 Cal.Rptr. 418, 424 (1989) (emphasis in original); *see also Baker v. Burbank–Glendale–Pasadena Airport Authority,* 220 Cal.App.3d 1602, 270 Cal.Rptr. 337 (1990); Restatement (Second) of Torts § 821C(1) (1977) ("In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference.").

The district court found that plaintiffs Stepakoff, Finkelstein, Kadish, and Ileto alleged harms that "meet[ ] the requirement that they suffer harm different in kind, rather than degree, from the general

---

**26.** Defendants argue, and the district court agreed, that nuisance law does not apply to the lawful manufacture and sale of non-defective products. *See Ileto,* 194 F.Supp.2d at 1058. Although the district court noted that no California court has addressed whether a public nuisance claim will lie under the circumstances presented in this case, it agreed with the Eighth Circuit that "if defective products cannot constitute a public nuisance, then products which function properly do not constitute a public nuisance." *Id.* (quoting *City of Philadelphia v. Beretta U.S.A., Corp.,*

126 F.Supp.2d 882, 909 (E.D.Pa.2000), *aff'd,* 277 F.3d 415 (3d Cir.2002)).

Plaintiff's nuisance claim, however, is not about the manufacture or distribution of a defective or properly functioning product. Notably, plaintiffs do not allege a product defect but rather allege affirmative conduct on the part of manufacturers and distributors that fosters an illegal secondary gun market that interfered with the public right to safety. The California Supreme Court has never limited public nuisance suits in a manner that would prevent the claim alleged here.

public." *Ileto,* 194 F.Supp.2d at 1057. The district court declined to "conclusively resolve" the issue of whether Powers, who was not shot, but witnessed the shootings and was traumatized by the events, also suffered a harm different in kind, rather than degree, from the general public because it ultimately denied all of the plaintiffs' nuisance claims on other grounds as well. *Id.*

We agree that, on the basis of the facts alleged, plaintiffs Stepakoff, Finkelstein, Kadish, and Ileto all suffered an injury, namely trauma resulting from an assault with a gun and gun shot wounds, different in kind from the general public. Furthermore, plaintiff Powers allegedly suffered "specific and direct physical and emotional injuries ... by[the] shock to his nervous system upon experiencing and witnessing the events described herein." This harm is different in kind from the harm allegedly suffered by the general public. These physical and mental injuries are different in kind from the "danger, fear, inconvenience, and interference with the use and enjoyment of public places that affect the tenor and quality of everyday life" that plaintiffs allege are suffered by the general public.

### 2. GLOCK'S CONTROL OVER THE FIREARM WHEN DISCHARGED

Glock also argues that the plaintiffs failed to allege that Glock had control over the gun when the plaintiffs were injured and that such control is a necessary element of a nuisance claim. Although it is unclear under California law whether a special relationship demonstrating control over the instrument that caused the nuisance is required for showing proximate cause, *compare City of San Diego v. U.S. Gypsum Co.,* 30 Cal.App.4th 575, 35 Cal.

Rptr.2d 876, 882 (1994) (declining to decide whether California nuisance law requires the defendant to own or control the means of causing the nuisance), *with Martinez,* 275 Cal.Rptr. at 883(rejecting a nuisance claim because it concluded that there was no special relationship between the defendant and the third party and therefore no proximate causation), we agree with the district court that if the California Supreme Court were confronted with this issue, it would require a showing of legal or proximate causation. However, we conclude that California's law of proximate or legal cause does not contain a control requirement. "Proximate causation requires simply that the act or omission of the defendant be a 'substantial factor to the harm suffered.'" *Adams v. City of Fremont,* 68 Cal.App.4th 243, 80 Cal.Rptr.2d 196, 211 (1998) (quoting *Mitchell v. Gonzales,* 54 Cal.3d 1041, 1 Cal.Rptr.2d 913, 819 P.2d 872 (1991)). Here, as described above in our discussion of the proximate causation required for negligence liability, *see supra* at pp. 1205–1208, plaintiffs have sufficiently alleged that Glock's actions fostered an illegal secondary market that foreseeably led to a prohibited purchaser, Furrow, gaining access to firearms that he later used to kill and injure innocent people.

The Ohio Supreme Court, which, like the California Supreme Court, also has adopted the interpretation of nuisance as set forth in the Restatement (Second) of Torts,[27] rejected a similar claim by defendants who argued that they could not be held liable for the harm alleged because they did not have control over the alleged nuisance at the time of the injury. "[A]ppellant alleged that appellees control the creation and supply of this illegal second-

---

**27.** *See Cincinnati v. Beretta U.S.A., Corp.,* 95 Ohio St.3d 416, 768 N.E.2d 1136, quoting 4 Restatement (Second) of Torts § 821B(1) (1965) (defining a public nuisance as "an unreasonable interference with a right common to the general public.").

ary market for firearms, not the actual use of the firearms that cause injury ... Just as the individuals who fire the guns are held accountable for the injuries sustained, appellees can be held liable for creating the alleged nuisance." *City of Cincinnati,* 768 N.E.2d at 1143. The Ohio Supreme Court explained the relationship between control and causation as follows:

> [I]t is not fatal to appellant's public nuisance claim that appellees did not control the actual firearms at the moment that harm occurred ... appellant alleged that appellees control the creation and supply of this illegal, secondary market for firearms, not the actual use of the firearms that cause injury. Just as the individuals who fire the guns are held accountable for the injuries sustained, appellees can be held liable for creating the alleged nuisance.

*Id.; see also City of Chicago,* 271 Ill.Dec. 365, 785 N.E.2d at 31.[28]

Thus, we conclude that Glock's acts as alleged in the FAC would allow a reasonable jury to conclude that the defendants' acts were the cause of the plaintiffs' injury. The plaintiffs have not alleged that Glock or the other defendants had control over the guns at the time of the shooting, but this is not fatal to their public nuisance claims.

### 3. CALIFORNIA LAW DOES NOT LIMIT NUISANCE TO PROPERTY CLAIMS

 The district court concluded that a nuisance claim could not lie here by rely-ing on a Michigan state case (a case that was cited "with approval" by the California Supreme Court in *City of San Diego* ) that holds that "nuisance cases 'universally' concern the use or condition of property, not products." *Ileto,* 194 F.Supp.2d at 1058(quoting *Detroit·Bd. of Educ. v. Celotex Corp.,* 196 Mich.App. 694, 493 N.W.2d 513, 521 (1992)). However, the district court's determination that a nuisance must be associated with property is contrary to clearly established California law. California law has never imposed such a requirement that there be some form of an injury to land or property; indeed, as noted above, California common law consistently has defined nuisance in broad terms that encompass injuries to health, or acts that are "indecent or offensive to the senses" *or* obstructions to the free use of property in any manner that might interfere with the "comfortable enjoyment of life *or* property." *Acuna,* 60 Cal.Rptr.2d 277, 929 P.2d at 615(citing Cal. Civ.Code § 3479) (emphasis added); *see also Venuto v. Owens–Corning Fiberglas Corp.,* 22 Cal.App.3d 116, 99 Cal.Rptr. 350, 355 (1971) ("[T]he term 'public nuisance' comprehends an act or omission which interferes with the interests of the community or the comfort and convenience of the general public and includes interference with the public health, comfort and convenience.") (internal citations omitted).[29]

**28.** We recognize that the plaintiffs in these public nuisance cases were cities rather than individuals. However, it is clear that under California law an individual may make a public nuisance claim. California Civil Code section 3493 provides that a "private person may maintain an action for public nuisance, if it is specially injurious to himself, but not otherwise."

**29.** In light of these California cases and California Civil Code section 3479, the dissent's contention that we rely on out of state law to support our conclusion that under California law there is no requirement that nuisance be associated with property is puzzling. Furthermore, we have "an answer for the following twelve words—'nuisance cases 'universally' concern the use or condition of property, not products.' " Dissent at 1223, citing *City of San Diego,* 30 Cal.App.4th at 586, 35 Cal. Rptr.2d 876. The dissent fails to note that its quotation is from a citation to a Michigan Court of Appeals case, cited by the California Court of Appeal to support its contention that other "courts that have considered this question [whether plaintiffs can recover damages for defective asbestos-containing building ma-

Comment h to Section 821B of the Restatement (Second) of Torts states that "unlike a private nuisance, a public nuisance does not necessarily involve interference with use and enjoyment of land." Restatement (Second) of Torts § 821B, comment h; *see also City of Chicago v. Beretta U.S.A. Corp.*, 337 Ill.App.3d 1, 271 Ill.Dec. 365, 785 N.E.2d 16 (2003) (rejecting contention that public nuisance law is limited to actions involving real property or to statutory or regulatory violations involving public health or safety and permitting nuisance claim to go forward);[30] *City of Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St.3d 416, 768 N.E.2d 1136, 1142 (2002) (same).

**4. CALIFORNIA LAW PERMITS NUISANCE SUITS IN LEGAL, REGULATED INDUSTRIES**

■ Additionally, the fact that the manufacture and sale of guns is legal does not prevent the plaintiffs from pursuing their nuisance claim. Here, the alleged nuisance is not premised on the legal manufacture and design of the guns or the sale of guns to individuals who are legally entitled to purchase them. On the contrary, the nuisance claim rests on the defendants' actions in creating an illegal secondary market for guns by purposefully over-saturating the legal gun market in order to take advantage of re-sales to distributors that they know or should know will in turn

sell to illegal buyers. We agree with the Ohio Supreme Court's conclusion "that under the Restatement's broad definition, a public nuisance action can be maintained for injuries caused by a product if the facts establish that the design, manufacturing, marketing, or sale of the product unreasonably interferes with a right common to the general public." *City of Cincinnati*, 768 N.E.2d at 1142.

Over one hundred years ago, a California state court explained that the fact that a certain occupation or business can be performed in a legal manner does not prevent that occupation or business from becoming a nuisance when the occupation or business is performed in a manner that unreasonably infringes on a public right. *See Woodruff v. North Bloomfield Gravel Mining Co.*, 9 Sawy. 441, 18 F. 753 (1884) (explaining that although mining is lawful and regulated by statute, the "results of those acts" can become a public or private nuisance). The fact that a statute recognizes the legality of a certain occupation and makes provision for its regulation to avoid injuries does not justify or legalize such a business when it becomes a public nuisance. *See id.*

Similarly, although gun manufacturing is legal and the sale of guns is regulated by state and federal law, the distribution and marketing of guns in a way that creates

---

terials under a nuisance action] have rejected a nuisance claim as a theory of recovery for asbestos contamination." *City of San Diego*, Cal.App. 4th at 586. *City of San Diego* was a products liability suit. The California Court of Appeal in *City of San Diego* addressed the plaintiff's attempt to maintain a products liability action as a nuisance action, explaining that "no California decision ... allows recovery for a defective product under a nuisance cause of action." *Id.* This is not a products liability action; unlike *City of San Diego*, here we do not have "a products liability action in the guise of a nuisance action." *Id.* at 587, 35 Cal.Rptr.2d 876.

**30.** In Illinois, as in California, the state supreme court has adopted the Restatement (Second) of Torts definition of public nuisance. *See City of Chicago v. Beretta U.S.A. Corp.*, 337 Ill.App.3d 1, 271 Ill.Dec. 365, 785 N.E.2d 16, 24 (2002). *See also Young v. Bryco Arms*, 765 N.E.2d 1, 10–11 (2001) (citing section 821B to define public nuisance and holding that plaintiffs' complaints sufficiently pleaded a right common to the general public, unreasonable interference with that right, and resulting damages, as the elements of a cause of action for public nuisance in a case against gun manufacturers).

and contributes to a danger to the public generally and to the plaintiffs in particular is not permitted under law. Plaintiffs allege that the defendants knew or should have known that their marketing, promotion, distribution, importation, and sale of firearms, by which each of the firearms used in the incidents alleged here came to be in the possession of a person like Furrow, would likely result in injuries of the type suffered by the plaintiffs. *See Nat'l Ass'n for the Advancement of Colored People v. Acusport, Inc.*, 271 F.Supp.2d 435, 484 (E.D.N.Y.2003) (finding, after trial, that the plaintiffs demonstrated that the defendants created a public nuisance and rejecting defendant gun manufacturers' defense that selling guns is legal because "[w]hile the fact that a defendant's conduct is otherwise lawful is a factor to consider in determining whether the interference with the public right is substantial, it is no defense to an action for public nuisance.... That a regulatory statutory scheme exists to govern some conduct does not alone mean that conduct is fully authorized.").

We conclude that the plaintiffs have alleged sufficient facts under well established California Supreme Court nuisance law to survive the defendants' Rule 12(b)(6) motion, and therefore reverse the district court's ruling granting Glock's motion to dismiss the public nuisance claim.

## IV. NEGLIGENCE AND NUISANCE CLAIMS AGAINST NORINCO

We agree with the district court that the plaintiffs' allegation that Furrow used a 9mm gun in both shootings, and the plaintiffs' allegation that the Norinco gun used 9mm ammunition, was sufficient for purposes of the defendants' motion to dismiss to connect Norinco to plaintiffs' injuries. The general factual allegations stated in the FAC apply to all defendants, including the allegations regarding the creation of a secondary market that targets illegal gun purchasers. These general allegations include the claim that, despite the extensive documentation in ATF reports and information that identifies those distributors that provide the most guns to illegal purchasers, manufacturers and distributors, including Norinco, continue to develop distribution channels that promote straw purchases and other means of distribution that facilitate access to guns by prohibited purchasers.

We note that the specific allegations in the FAC that trace the Glock gun from the manufacturer to the police department to several distributors, including RSR, to gun collectors and ultimately to Furrow do not apply to Norinco. However, because the general allegations included in the FAC described above satisfy all of the requisite elements for negligent distribution and public nuisance claims, we also reverse the district court's dismissal of plaintiffs' negligence and nuisance claims against Norinco.

## V. DEFENDANTS RSR MANAGEMENT AND RSR GROUP NEVADA

Plaintiffs alleged with particularity the role of RSR as a distributor that enabled Furrow to obtain the Glock gun that he used to shoot and kill Ileto. Therefore, the analysis above with respect to the negligence and nuisance claims against Glock applies to RSR as well. Both were key players in the distribution scheme that allegedly targeted illegal purchasers. RSR, as the distributor, had access to the same ATF reports and, as alleged in the complaint, knew or should have known that, by furnishing Dineen with two new Glock guns and agreeing that payment did not have to be made until the former guns were sold, they were contributing to the creation of the illegal market that enabled a prohibited purchaser like Furrow to obtain the gun he used to kill Ileto and may have used to shoot the victims at the JCC.

Accordingly, we reverse the district court's dismissal of the plaintiffs' negligence and nuisance claims against RSR.

## VI. BUSHMASTER, REPUBLIC ARMS, JIMMY DAVIS, AND DAVIS INDUSTRIES

Although most of the analysis above with respect to Glock and Norinco would apply to Bushmaster, Republic Arms, Jimmy Davis, and Davis Industries if the guns they manufactured had been fired by Furrow, a claim for nuisance and negligence cannot stand where the weapons were not actually fired. The guns produced by these manufacturers were carried by Furrow on the day of the shootings, but they were not chambered for 9mm ammunition. The facts alleged that only the Glock and Norinco guns were capable of expending the 9mm casings. The requirements for a negligence claim, including allegations that the manufacturers' breach caused the plaintiffs' injuries, cannot be met where the gun was not fired. Furthermore, under a nuisance claim, the requirement that plaintiffs allege injuries different in kind from those suffered by the general public, could not be met under these circumstances when the gun at issue was not allegedly fired. Therefore, we affirm the district court's orders dismissing plaintiffs' action against Bushmaster, Republic Arms, Jimmy Davis, and Davis Industries.

## VII. LILIAN ILETO'S SURVIVAL AND WRONGFUL DEATH CLAIMS

In addition to the nuisance and negligence claims alleged by the other plaintiffs, Lilian Ileto brought under Count I a survival claim. In Count I, Lilian Ileto sought damages for all loss or damage that Ileto sustained or incurred before death as a result of the defendants' conduct, including punitive damages that Ileto would have been entitled to recover had he lived, together with attorneys' fees and other costs. Lilian Ileto also alleged a wrongful death claim in Count II. On appeal, plaintiffs do not specifically address the wrongful death and survival claims as distinct from the negligence and nuisance claims. Plaintiffs note in their statement of the case that the FAC retained Ileto's survival and wrongful death claims, but the plaintiffs do not mention them again in their opening brief or in their statement of the issues.

However, because the survival and wrongful death claims incorporate the negligence and nuisance claims, we conclude that Lilian Ileto may continue to pursue these claims on remand.[31] Therefore, our reversal of the summary judgment against the plaintiffs on the negligence count also encompasses the summary judgment against Lilian Ileto on her wrongful death and survival claims.[32]

## VIII. COMMERCE CLAUSE DOES NOT BAR THIS SUIT

 Finally, the defendants argue that the FAC is "so broadly drafted as to manifest regulatory ambitions that run afoul of the United States Constitution." Specifically, the defendants contend that the suit

---

**31.** California courts consistently incorporate the elements of a negligence claim into a wrongful death claim. *See, e.g., Anaya v. Superior Court,* 96 Cal.App.4th 136, 116 Cal. Rptr.2d 660, 662 (2002) (explaining that plaintiffs had "alleged facts sufficient to plead the elements of duty and breach for a negligence (wrongful death) cause of action.") (parenthetical in original); *see also Sandoval v. Bank of America,* 94 Cal.App.4th 1378, 115 Cal.Rptr.2d 128, 130 (2002) (addressing petitioner's wrongful death complaint on the basis of defendant's alleged negligence).

**32.** With respect to the survival and wrongful death claims, the FAC set forth the necessary declarations and attachments to establish Lilian Ileto as sole heir and the one entitled to Ileto's property for intestate succession. *See* Cal. Prob.Code sections 377.30 & 377.60.

would violate the Commerce Clause and the Due Process Clause because it would regulate a lawful national industry. We reject both claims.

Generally, Commerce Clause claims are brought against a state law or regulation. "In order to establish a claim under the so-called dormant Commerce Clause, [Defendants] must show that the state law or regulation in question penalizes interstate commerce, and does so without sufficient economic justification." *National Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 857 (9th Cir.), *amended on denial of reh'g en banc*, 312 F.3d 416 (2002); *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) ("Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.").

However, in *BMW of North America v. Gore*, the Supreme Court noted that a statute or regulation is not necessary for asserting a dormant Commerce Clause claim: "State power may be exercised as much by a jury's [or judge's] application of a state rule of law in a civil lawsuit as by a statute." 517 U.S. 559, 572 n. 17, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Additionally, the Supreme Court has explained that "it follows from these principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." *Id.* at 572, 116 S.Ct. 1589.

The present case is clearly distinguishable from *BMW*. First, in their FAC, plaintiffs abandoned all requests for injunctive relief and economic sanctions in the form of punitive damages to protect the rights of citizens from other states. In *BMW*, the Supreme Court vacated a punitive damages award as excessively large under the Due Process Clause. Furthermore, the "regulation" alleged by the defendants in this case could not be construed as one which purposefully or arbitrarily discriminates between residents and nonresidents. Rather, the economic "regulation" that defendants allege is most accurately construed as a form of regulation that "has only indirect effects on interstate commerce and regulates even-handedly." *Brown–Forman Distillers Corp. v. New York Liquor Authority*, 476 U.S. 573, 578–79, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). When this type of regulation is at issue, the Supreme Court has stated that we must "examine[ ] whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Id.*

Here, the state's interest in protecting the health and safety of its residents is clearly legitimate, and whatever indirect burden an award of damages to the plaintiffs might have on the defendants, it does not approximate the public interest in protecting the health and safety of California's citizens. In sum, the defendants' Commerce Clause argument is meritless and we reject it.

CONCLUSION

For the reasons stated above, we reverse the district court's orders granting dismissal of the plaintiffs' actions against Glock, Norinco, and RSR on the negligence, public nuisance, survival, and wrongful death claims, and remand for further proceedings. We affirm the district court's orders granting dismissal of the plaintiffs' action against Bushmaster, Republic Arms, Jimmy Davis, and Davis Industries.

All parties to bear their own costs on appeal.

REVERSED in part, AFFIRMED in part, and REMANDED.

CYNTHIA HOLCOMB HALL, Circuit Judge, dissenting.

"Whatever personal emotions and personal views members of this court may have in this tragic case, those feelings must be put aside in resolving the narrow legal question decided here." *Merrill v. Navegar, Inc.*, 26 Cal.4th 465, 492, 110 Cal.Rptr.2d 370, 28 P.3d 116 (2001) (Kennard, J., concurring).

I understand the majority's desire to ensure that the appellants have their day in court. But I do not concur in the majority's opinion because I believe that it runs afoul of some of our most basic duties as federal judges. When exercising our diversity jurisdiction, we are required to apply state law whether we agree with it or not. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

The majority's almost exclusive reliance on authority from outside of California speaks volumes about how a California court would rule on this case. To reach its result, the majority must look outside California because when a proper analysis of California's statutes and cases is conducted, it becomes clear that the district court correctly dismissed appellants' claims. The majority essentially overlooks California law, relying instead on cases from other jurisdictions, nonbinding legal treatises, and abstract common law principles to arrive at its conclusions. But "[t]here is no general federal common law." *Erie*, 304 U.S. at 78, 58 S.Ct. 817. Sitting in diversity, we are not free to pick and choose from the many different common law principles

that have been developed in the fifty states. Our role is "to ascertain what the state law is, *not what it ought to be.*" *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (emphasis added).

When this case is analyzed under the applicable statute and most closely analogous California cases, this court has little choice but to affirm the district court's well-reasoned decision.

I respectfully dissent.

\* \* \*

As I explain below, the majority commits three errors in its analysis. First, it fails to recognize that this action is a products liability action and therefore is barred by a California statute. Cal. Civ.Code § 1714.4.[1] Second, the negligence theory espoused by the majority was specifically rejected by the California Supreme Court in *Merrill v. Navegar*, 26 Cal.4th 465, 110 Cal.Rptr.2d 370, 28 P.3d 116 (2001). Third, the nuisance theory adopted by the majority contradicts relevant California authority.

### THIS PRODUCTS LIABILITY ACTION IS BARRED BY SECTION 1714.4

The question of how to characterize this civil action is not merely academic-it is dispositive. In both their negligence and nuisance claims, appellants allege that their injuries were caused by the potential of appellees' products to cause serious injury or death. But in products liability actions, California Civil Code section 1714.4 declares that "[i]njuries or damages resulting from the discharge of a firearm or ammunition are not proximately caused

---

1. Although the statute was repealed effective January 1, 2003, its repeal does not affect this action because the Legislature did not express an intent to apply its repeal retroactively. *See Myers v. Philip Morris Companies, Inc.*, 28 Cal.4th 828, 840, 123 Cal.Rptr.2d 40, 50 P.3d 751 (2002) ("retroactive application [of a law] is impermissible unless there is an express intent of the Legislature to do so"). Section 1714.4 was in effect when the instant action was filed and when the events giving rise to it occurred.

by its potential to cause serious injury, damage, or death, but are proximately caused by the actual discharge of the product." Cal. Civ.Code § 1714.4(b)(2). Thus, the plain terms of this statute preclude appellant's theory of causation. The majority gets around this absolute bar to appellants' claims by arguing that appellants have not actually brought a products liability lawsuit. But the claims alleged by appellants can be characterized as nothing but products liability claims.

A brief history of products liability law illustrates why this is a products liability action. Today, we take for granted that a manufacturer may be held liable for foreseeable damages caused by its products. But less than a century ago, this was a foreign concept in our nation's jurisprudence. At common law, a manufacturer was immune from liability in cases where the plaintiff alleged an injury that was caused by the manufacturer's products, absent privity between the manufacturer and the plaintiff. With Justice (then-Judge) Cardozo's landmark decision in *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916), the doctrine of privity as a bar to recovery in these suits began to wane. In *MacPherson*, the New York Court of Appeals allowed a driver to sue Buick in negligence after a defective tire caused him to be thrown from his car and injured, even though there was no privity between the driver and Buick–Buick had sold the car to a dealer first. *Id.* at 385–86, 111 N.E. 1050. Soon, not only consumers, but any person who could foreseeably be damaged by a product could sue in negligence for manufacturing or design defects. By 1963, even negligence was no longer a requirement, as the California Supreme Court, through Justice Traynor, established that manufacturers were strictly liable for injuries their defective products caused foreseeable victims. *See Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963). So in the span of half a century, tort law developed from effectively barring victims from suing a manufacturer for damages caused by products the manufacturer had placed in the stream of commerce, to allowing any foreseeable person who could be injured by a product to sue. This history provided the backdrop for the development of the branch of law known as products liability. No other branch of law deals with a manufacturer's liability to consumers or bystanders with whom it otherwise has no relationship for damages caused by its products.

To justify my conclusion that this is undoubtedly a products liability suit, I turn to the very case that appellants have cited most often to support their theories, *Stevens v. Parke, Davis, & Co.*, 9 Cal.3d 51, 107 Cal.Rptr. 45, 507 P.2d 653 (1973). In *Stevens*, the plaintiffs alleged that the defendant drug manufacturer was negligent because it over-promoted the drug Chloromycetin with the intent that doctors would not prescribe it correctly. *Id.* at 65, 107 Cal.Rptr. 45, 507 P.2d 653. This theory closely parallels what plaintiffs suggest here: the gun manufacturers over-sold their products knowing that the guns would end up in the hands of people who would misuse them. In *Stevens*, the California Supreme Court treated the action as a products liability action. *See id.* at 64, 107 Cal.Rptr. 45, 507 P.2d 653 ("One who supplies a product directly or through a third person 'for another to use is subject to liability to those whom the supplier should expect to use the [product]' ") (quoting Restatement (Second) of Torts § 388, which describes failure to warn claims in products liability law). Given the similarities between this case and *Stevens*, California courts would be required to treat this case as a products liability action. As such, it is governed by section 1714.4.

The majority insists that this a *"classic negligence and nuisance case."* At the same time, however, the majority does not cite a single case from California which relies upon a nonproducts liability theory to hold a manufacturer liable for injuries caused by the use of its products. The majority tells us this case is not about defective products; it is about "certain affirmative conduct . . . that fosters an illegal secondary gun market." But when it accepts appellees' negligent marketing argument, the majority allows itself to be persuaded by an argument that is irrelevant in tort except insofar as it tends to prove one element in a products liability cause of action. Whether the gun manufacturers sell their products with the knowledge that they will find their way to criminals may bear upon who is a foreseeable plaintiff in the event that a defective gun causes injury. But to assert that this action is not about products borders on the absurd. This case is about guns. If appellees were selling bubble gum, the case would be markedly different. Alleging a defect or failure to warn is generally necessary to prevail in a products liability suit, but it is not the *sine qua non* for bringing a suit that sounds in products liability. The nature of appellees' conduct cannot be analyzed apart from the *product* they are selling.

Under section 1714.4, appellants' claims are doomed. Both claims allege that the

injuries were caused by appellees' products' potential to cause serious injury, damage, or death. However, "[i]njuries or damages resulting from the discharge of a firearm or ammunition are not proximately caused by its potential to cause serious injury, damage, or death, but are proximately caused by the actual discharge of the product." Cal. Civ.Code § 1714.4(b).[2] California law unequivocally states that these injuries and damages were proximately caused by the shooter, Buford Furrow.

I would affirm the dismissal of all claims on this statutory basis alone.

## THE MAJORITY'S NEGLIGENCE THEORY WAS REJECTED BY THE CALIFORNIA SUPREME COURT IN MERRILL

The majority and appellants argue that appellees were negligent in that they breached a duty not to market their firearms products to criminals and others likely to misuse them. But California's highest court has specifically rejected this theory.

In *Merrill v. Navegar,* the California Supreme Court held that no cause of action could lie for a claim of "negligent marketing" of firearms. 26 Cal.4th at 483, 110 Cal.Rptr.2d 370, 28 P.3d 116. Like the incident underlying this case, the incident involved in *Merrill* was a violent tragedy of the kind which has become all too

---

**2.** The majority and both parties seem to assume that section 1714.4 bars all products liability suits against gun manufacturers. But section 1714.4 does nothing of the sort. Rather, it states that certain types of analyses shall not be made in products liability actions. Section 1714.4 certainly would not bar a suit based on a manufacturing defect. For example, if a person were injured by a Colt .45 that was defective because it fired a bullet backward, rather than forward, that person could still sue the manufacturer of the gun for damages. Such an action would indisputably be a products liability action. Nothing in section

1714.4 would preclude it, for the plaintiff's injuries would be caused by the defective "discharge of a firearm," not by the gun's *potential* to cause injury. Cal. Civ.Code § 1714.4(b). The gun would not "be deemed defective in design on the basis that the benefits of the product do not outweigh the risk of injury posed by its potential to cause serious injury, damage, or death when discharged." *Id.* at § 1714.4(a). Instead, the gun would be defective because it "deviate[d] from the manufacturer's intended result." *Barker v. Lull Engineering Co.,* 20 Cal.3d 413, 424, 143 Cal. Rptr. 225, 573 P.2d 443 (1978).

common in our nation's life. A crazed man bought an assault weapon and went on a shooting spree. Families of the victims sought to hold the manufacturers of the guns responsible under a negligence theory. In affirming the trial court's dismissal of the suit, the California Supreme Court held that section 1714.4 barred such a cause of action.

Like the majority here, the plaintiffs in *Merrill* argued that "section 1714.4 has no application to this case because it is not a product[s] liability action." *Id.* at 478, 110 Cal.Rptr.2d 370, 28 P.3d 116. Like the majority, the *Merrill* plaintiffs argued that they sought to hold the gun manufacturer "liable for its negligent conduct, not for making a defective product." *Id.* But the California Supreme Court flatly rejected this argument, observing that negligent conduct could not be analyzed separately from product design:

> [V]irtually every person suing for injuries from firearm use could offer evidence the manufacturer knew or should have known the risk of making its firearm available to the public outweighed the benefits of that conduct, and could therefore raise a triable issue of fact for the jury. In each of these cases, the jury would be asked to do precisely what section 1714.4 prohibits: weigh the risks and benefits of a particular firearm. The result would be to resurrect the very type of lawsuit the Legislature passed section 1714.4 to foreclose ...

*Id.* at 486, 110 Cal.Rptr.2d 370, 28 P.3d 116.

The majority attempts to distinguish this case from *Merrill* with the allegation that appellees' marketing scheme "specifically target[ed] criminal users" as opposed to the general public. But it is a legally insignificant distinction that appellees allegedly marketed their guns to criminals intentionally, rather than just with the knowledge that criminals would obtain the guns. *See* Restatement (Second) of Torts § 8A, cmt. b (1965) ("Intent is not ... limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result."); *see also Vision Air Flight Serv. v. M/V Nat'l Pride,* 155 F.3d 1165, 1176 (9th Cir.1998) (knowledge that cargo would be destroyed is legally the same as intentionally destroying cargo); *Schroeder v. Auto Driveaway Co.,* 11 Cal.3d 908, 922, 114 Cal.Rptr. 622, 523 P.2d 662 (1974) (adopting Restatement rule).

Furthermore, like the "conduct" at issue in *Merrill,* this allegedly negligent conduct cannot be analyzed without weighing a particular firearm's risks in relation to its benefits. What kind of firearm was allegedly marketed to criminals is bound up with whether appellees' marketing choices were prudent. Marketing a hunting rifle knowing it will end up in the hands of criminals is different from marketing an assault weapon knowing it will end up in the hands of criminals. The majority's holding will require "a jury ... to do precisely what section 1714.4 prohibits: weigh the risks and benefits of a particular firearm." *Merrill,* 26 Cal.4th at 486, 110 Cal.Rptr.2d 370, 28 P.3d 116.

In fact, the majority's opinion invites juries to engage in this type of cost/benefit analysis. The majority states that the "social value of manufacturing and distributing guns without taking basic steps to prevent these guns from reaching illegal purchasers and possessors cannot outweigh the public interest in keeping guns out of the hands of illegal purchasers and possessors who in turn use them in crimes like the one that prompted plaintiffs' action here." Maj. Op. at 1205–1206. The majority then assures us that "[t]he debate

over the social value of guns generally need not enter this case; rather, we must limit our evaluation to the social value of defendants' interest in distributing the guns" as the complaint alleges. *Id.* But section 1714.4 prohibits more than a generalized assessment of the social values of guns. It prohibits a cost/benefit analysis of specific firearms and ammunition as well. *See Merrill,* 26 Cal.4th at 480–86, 110 Cal.Rptr.2d 370. And to measure "the social value of defendants' interest" in distributing specific firearms in the manner alleged, it is necessary to evaluate the social value of these firearms.

The majority's negligence theory is essentially the same theory Justice Werdegar described in her dissent in *Merrill:*

Plaintiffs' claim of negligence is, at bottom, that defendant Navegar ... acted without due care in distributing the TEC 9/DC9–a semiautomatic handgun combining portability and ease of use with an extraordinary rapidity and capacity for lethal firepower ... Plaintiffs do not claim that the TEC 9/ DC9 is defective; nor do they even claim that defendant acted negligently *simply by making* the TEC 9/ DC9. Plaintiffs allege negligence, rather, in Navegar's *selling that firearm on the general civilian market knowing it would attract purchasers likely to misuse it,* rather than restricting sales to buyers with a lawful use for the tools of assaultive violence, such as police and military units. This theory of negligence [rests]

on the allegation that particular marketing choices by Navegar were imprudent ...

*Id.* at 493, 110 Cal.Rptr.2d 370 (Werdegar, J., dissenting) (emphasis in the original). In defending this theory, however, Justice Werdegar stood alone.

*Merrill* also forecloses a theory that appellees are liable for "negligent advertising" or other efforts to reach out to people like Furrow. In *Merrill,* the California Supreme Court held that for a gun manufacturer to be liable for such conduct, a plaintiff would have to prove at least that the shooter asked for the guns used "by name." *Id.* at 491, 110 Cal.Rptr.2d 370. Appellants have not alleged that Furrow asked for a Glock, or any other weapons he used, by name.[3]

Other California authority, too, supports dismissing this case. In *Jacoves v. United Merchandising Corp.,* the California Court of Appeal affirmed the trial court's judgment on the pleadings in favor of a firearms dealer in a negligence action attempting to hold the dealer liable for the suicide death of 20–year–old Jonathan Jacoves. 9 Cal.App.4th 88, 11 Cal.Rptr.2d 468 (1992). Plaintiffs alleged that Jacoves walked into a Big–5 store and tried to buy a handgun and ammunition. When he learned that he could not purchase the gun until the statutory waiting period had passed, he left the store. *Id.* at 118, 11 Cal.Rptr.2d 468. Later, he returned to the store to buy a rifle for which there was

---

**3.** If anything, the facts alleged here are less compelling than the facts alleged in *Merrill.* In *Merrill,* the plaintiffs alleged that the defendant gun manufacturer was negligent in that it marketed its guns to the general public while knowing that the guns would find their way to criminals. Here, appellants allege that the appellee gun manufacturers were negligent by marketing their guns to *law enforcement* while knowing that the guns will find their way to criminals. But appellants' allegation that the gun manufacturers pur-

posefully "over-marketed" their product to law enforcement, which made the guns reach illegal markets faster, is not legally cognizable. The complaint alleges that "to win favor among police forces" appellees would "offer[ ] incentives, deals, upgrades, and encourag[e] police departments to try out new models." FAC ¶ 147. There is nothing tortious about this behavior. In general, a manufacturer of a legal product has no duty to refrain from attempting to sell as many products as possible.

no waiting period. "At the time of this purchase, [Jacoves] appeared youthful, confused, distraught, and trembling. He purchased a rifle and ammunition and was instructed in the use of the rifle. On that same day, he committed suicide with the Big–5 rifle." *Id.* The Court of Appeal held, as a matter of law, that such allegations were insufficient to establish that Big–5 owed Jacoves a duty of care. *Id.* The court found that Big–5 had no reason to anticipate that Jacoves "intended to commit suicide." *Id.*

The court in *Jacoves* held the plaintiffs to a much higher burden than this majority, which merely states that the "type of harm" alleged was foreseeable and that appellees therefore owed appellants a duty of care. *Jacoves* rejected this approach. Certainly the type of harm suffered in *Jacoves*-a gunshot wound-was foreseeable. Even so, the court focused on specific conduct by specific individuals, inquiring whether Big 5 employees knew of facts that would make Jacoves' suicide reasonably foreseeable. Here, there was no allegation that appellees knew that Buford Furrow would go on a shooting spree. Yet *Jacoves* requires just such an allegation to establish a duty of care.

For all these reasons, I would affirm the district court's dismissal of the negligence claim.

## THE NUISANCE THEORY IS INCONSISTENT WITH CALIFORNIA LAW

The nuisance issue is simple. The majority ought to have disposed of it easily. I quote unequivocal language from the California Court of Appeal:

> Nuisance has been described as an "impenetrable jungle." . . . Civil Code section 3479 defines a nuisance as "[a]nything which is injurious to health,

or indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . ."

> City cites no California decision, however, that allows recovery for a defective product under a nuisance cause of action. Indeed, under City's theory, nuisance "would become a monster that would devour in one gulp the entire law of tort . . . ."

> *[N]uisance cases "universally" concern the use or condition of property, not products.*

*City of San Diego v. U.S. Gypsum Co.*, 30 Cal.App.4th 575, 585–86, 35 Cal.Rptr.2d 876 (1994) (emphasis added) (citations omitted).

Despite this clear language from a California appellate court, the majority states that "the district court's determination that a nuisance must be associated with property is contrary to clearly established California law." Amazingly, as authority for the clearly established law of *California*, the majority cites the *Ohio* Supreme Court and an *Illinois* appellate court. But it is the law of California that we are obliged to interpret today, not the law of Ohio or Illinois. *Cf. Erie*, 304 U.S. at 78, 58 S.Ct. 817. No California court has ever allowed a public nuisance claim to proceed against a manufacturer for lawful products which have been lawfully placed in the stream of commerce. *See City of San Diego*, 30 Cal.App.4th at 586, 35 Cal. Rptr.2d 876. It therefore comes as no surprise that the majority does not cite a single California nuisance case in which the alleged nuisance did not relate to real property.[4]

---

4. The majority maintains that the California Supreme Court "has never limited public nuisance suits in a manner that would prevent the claim alleged here." Perhaps this is true but I am aware of no principle of law dictating that a cause of action exists because the state's highest court has not rejected it.

While it devotes many pages to interpreting the Restatement and cases from foreign jurisdictions, the majority has no answer for the following twelve words: "nuisance cases 'universally' concern the use or condition of property, not products." *City of San Diego*, 30 Cal.App.4th at 586, 35 Cal.Rptr.2d 876.[5]

I would affirm the dismissal of the nuisance claim.

\* \* \*

Basic principles of federalism require us to follow the will of the California Legislature, as construed by California's highest court, when interpreting the substantive law of California. We must be especially mindful of these principles when the subject matter is sensitive and controversial and when the state's legislature and high court have addressed it. As a federal court, we may not expand the authoritative pronouncements of a state's law in search of ways to reach what we view as a just result.

In passing section 1714.4, the California Legislature exempted gun manufacturers from liability for horrific incidents like the San Fernando Valley shootings of August 10, 1999. This may have been an unwise policy, but it is not a policy which we are at liberty to ignore. Like Justice Kennard in *Merrill*, I am troubled by the facts which give rise to this case. But I too am convinced that it "is not for us to question the wisdom of the Legislature's considered judgments." *Merrill*, 26 Cal.4th at 492, 110 Cal.Rptr.2d 370, 28 P.3d 116 (Kennard, J., concurring).

The debate over the extent to which gun manufacturers should be held liable to victims of gun violence belongs in the democratic process. The public debate benefits from able advocates on all sides—we need not enter it.

I would affirm the district court's dismissal of all claims.

---

5. This statement was not a dictum. It was necessary to the court's decision rejecting a nuisance cause of action based upon defendant's products. In any event, a "federal court exercising diversity jurisdiction is bound to follow the considered dicta as well as the holdings of state court decisions." *Homedics v. Valley Forge Ins. Co.*, 315 F.3d 1135, 1142 (9th Cir.2003) (quoting *Rocky Mountain Fire & Casualty Co. v. Dairyland Ins. Co.*, 452 F.2d 603, 603–4 (9th Cir.1971)).